IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| JANE DOE, et al., | : | Case No. 1:23-cv-318 |
| | : | |
| Plaintiffs, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| ARCHDIOCESE OF CINCINNATI, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

## ORDER AND OPINION

This matter is before the Court on Defendants' Motions for Summary Judgment (Docs. 29, 34). Plaintiff filed Responses in Opposition (Docs. 38, 43), to which Defendants filed Replies in Support (Docs. 45, 46). This matter is therefore ripe for the Court's review. For the following reasons, Defendants' Motions for Summary Judgment (Docs. 29, 34) are **GRANTED**.

## BACKGROUND

Defendant Moeller High School ("Moeller") is a private, Catholic high school operated by Defendant Archdiocese of Cincinnati ("Archdiocese"). (Beiersdorfer Decl., Doc. 26-1, ¶ 4.) Plaintiff Jane Doe was employed as an administrative assistant at Moeller from 2000 to 2021. (Doe Dep., Doc. 33-1, Pg. ID 1007, 1093.) Doe worked for Defendant Michael Asbeck from the time he was hired as Moeller's athletic director in 2012 until his termination in 2021. (*Id.* at Pg. ID 1138, 1165–66.) Doe brought this action because she

alleges that Asbeck sexually harassed and assaulted her, and that Moeller and the Archdiocese are liable for Asbeck's harassment and assault, and for what she characterizes as the constructive termination of her employment. (Compl., Doc. 4, Pg. ID 50–60.)

Moeller and the Archdiocese maintain a policy which prohibits sexual harassment, provides for reporting mechanisms, and outlines investigation procedures. (Doe Dep., Doc. 33-1, Pg. ID 1145–47; Harassment Policy, Doc. 26-1, Pg. ID 679–85.) This policy allows for reports to be made to any member of Moeller's administration, to human resources, or to the Archdiocese's reporting hotline. (Harassment Policy, Doc. 26-1, Pg. ID 679–85.) Doe was aware of the policy and had access to it during her term of employment at Moeller. (Doe Dep., Doc. 33-1, Pg. ID 1145–47.) While Moeller provided training on its sexual harassment policy, Doe opted not to attend. (Doe Dep., Doc. 33-1, Pg. ID 1146.) Additionally, Asbeck was aware of and received training on Moeller's harassment policy during his employment. (Kremer Decl., Doc. 26-4, ¶ 7; Collison Decl., Doc. 26-3, ¶ 11; Asbeck Acknowledgment, Doc. 26-4, Pg. ID 715–17.)

Before Asbeck's hiring in 2012, Moeller and the Archdiocese reviewed internal records from his previous employer, another high school in the Archdiocese, and verified that he had no record of misconduct. (Collison Decl., Doc. 32-3, ¶ 9.) Moeller and the Archdiocese also reached out to another previous employer of Asbeck's, St. Francis DeSales High School in Columbus, Ohio, to confirm that he had no record of misconduct while employed there. (Asbeck Dep., Doc. 25-1, Pg. ID 612; Collison Decl., Doc. 32-3, ¶ 9.) Additionally, Moeller and the Archdiocese confirmed that Asbeck's 2010 background

2

check, ordered by the Archdiocese and conducted by the Ohio Bureau of Criminal Identification and the Federal Bureau of Investigation, showed no criminal record. (Collison Decl., Doc. 32-3, ¶ 9.) Asbeck participated in Moeller's in-person interview process, meeting with Moeller's then-Principal/CEO Blane Collison and speaking with a three-member hiring panel. (*Id.* at ¶¶ 7–8.) The Archdiocese conducted periodic background checks on Asbeck during his employment at both Moeller and another archdiocesan school, confirming in 2010, 2015, and 2020 that he had no criminal record. (*Id.* at ¶ 10; Kremer Decl., Doc. 26-4, ¶ 6.)

While Doe was initially uncomfortable with Moeller's selection of Asbeck as its new athletic director, she did not feel that Asbeck engaged in any inappropriate conduct toward her during his first three years on the job. (Doe Dep., Doc. 33-1, Pg. ID 1010, 1032.) However, Doe felt that Asbeck was lazy, and she disagreed with him on several work-related matters. (*Id.* at Pg. ID 1011–13, 1044–45.) Doe was also frustrated when Moeller reduced her stipends, which were payments awarded to her in exchange for additional work with the athletic teams. (*Id.* at Pg. ID 1017–18.) Doe received stipends from Moeller for work performed in support of various sports camps from 2011 to 2021, and she received stipends for additional administrative work in 2012, 2013, and 2020. (Collison Decl., Doc. 32-3, ¶ 12; Doe Compensation Records, Doc. 26-1, Pg. ID 686–707.) However, she received no stipend pay for administrative work in 2011 and from 2014 to 2019. (Doe Compensation Records, Doc. 26-1, Pg. ID 686–707.)

In July 2016, Asbeck was involved in an incident at a Moeller golf outing in which he kissed a female bartender in both the locker room and parking lot of a local golf course.

3

(Asbeck Email, Doc. 25-3, Pg. ID 650.) Moeller and the Archdiocese were unaware of this incident until January 2019, when Asbeck's conduct was reported by the parent of a former Moeller student. (Kremer Decl., Doc. 26-4, Pg. ID 713.) After Moeller and the Archdiocese learned of the incident, Asbeck was formally reprimanded. (Asbeck Reprimand, Doc. 25-3, Pg. ID 651.)

Doe claims that in August 2016, Asbeck visited her home to view renovations that she and her husband had recently made. (Doe Dep., Doc. 33-1, Pg. ID 994–95.) During that encounter, Asbeck drank beer with Doe, commented on her clothing, requested to see the portion of her home containing her bedroom, and hugged her. (*Id.* at Pg. ID 1033–35.) Asbeck's presence made Doe feel anxious and uncomfortable, so she asked him to leave, and he did. (*Id.*) Doe did not report this incident to Moeller leadership until after she obtained a lawyer in January 2021. (*Id.* at Pg. ID 1035–36.) Aside from the hug at Doe's house in August 2016, Asbeck engaged in no alleged physical misconduct toward Doe before September 2020. (*Id.* at Pg. ID 1037–38.) However, Doe claims that during that period Asbeck made comments about her clothing, nail polish choices, and hair, and that Asbeck would periodically try to hug her until she eventually asked him to stop. (*Id.* at Pg. ID 1037, 1041–42.)

Asbeck's first sexual assault of Doe occurred on September 12, 2020, she alleges. (Doe Dep., Doc. 33-1, Pg. ID 1044; Doe Journal, Doc. 33-2, Pg. ID 1304.) On that day, after a football game, Doe returned to the athletic department's office. (Doe Journal, Doc. 33-2, Pg. ID 1304.) Asbeck returned to the office shortly after Doe. (*Id.*) Asbeck approached Doe and confessed his sexual desire for her, requesting that she engage in phone sex with

4

him and repeatedly asking her to engage in sexual relations. (*Id.*) Asbeck also told Doe that he could not stand up when he looked at her in the office, suggesting his sexual arousal. (*Id.*) Doe declined to engage in sexual activities, but Asbeck persisted, eventually grabbing her chest and kissing her despite her continued refusal. (*Id.*) Doe did not report this incident to Moeller or the Archdiocese at that time. (Doe Dep., Doc. 33-1, Pg. ID 1007, 1036, 1052.)

Doe alleges that Asbeck sexually assaulted her again in either late November or early December of 2020. (Doe Journal, Doc. 33-2, Pg. ID 1304.) In that incident, Doe was working in Moeller's concession stand when Asbeck unbuttoned her shirt, put his mouth on her breast, and put his hand into her pants. (*Id.*) Asbeck then put his hand inside Doe, despite her repeated requests to stop. (*Id.*) Doe did not report this incident to Moeller or the Archdiocese at that time. (Doe Dep., Doc. 33-1, Pg. ID 1007, 1036, 1052.)

Doe met with Moeller's then-President Marshall Hydzu on December 15, 2020. (Doe Dep., Doc. 33-1, Pg. ID 1050; Doe Journal, Doc. 33-2, Pg. ID 1305.) At that meeting, Doe requested to transfer to another position. (Doe Dep., Doc. 33-1, Pg. ID 1051; Doe Journal, Doc. 33-2, Pg. ID 1305.) Hyzdu questioned Doe about the reasons behind her request for a transfer, specifically asking about her working relationship with Asbeck, but she did not report any misconduct at this meeting. (Doe Dep., Doc. 33-1, Pg. ID 1050–51; Doe Journal, Doc. 33-2, Pg. ID 1305.) Hyzdu informed Doe that he could not act on her request without more information. (Doe Dep., Doc. 33-1, Pg. ID 1050–51.)

In January 2021, Doe spoke on two occasions with Moeller's then-Vice Principal, Carl Kremer. (Doe Dep., Doc. 33-1, Pg. ID 1052–53; Doe Journal, Doc. 33-2, Pg. ID 1305–

5

06; Kremer Decl., Doc. 26-4, ¶ 12.) During those meetings, Doe reiterated her desire to transfer to another department at Moeller. (Doe Journal, Doc. 33-2, Pg. ID 1305–06; Kremer Decl., Doc. 26-4, ¶ 12.) Doe also stated that she was unhappy working with Asbeck and that she hated him. (Doe Journal, Doc. 33-2, Pg. ID 1305–06; Kremer Decl., Doc. 26-4, ¶ 12.) Still, Doe did not report any misconduct at this meeting, nor did she suggest that her request to transfer related to a disability. (Doe Dep., Doc. 33-1, Pg. ID 1006, 1052–53; Doe Journal, Doc. 33-2, Pg. ID 1305–06; Kremer Decl., Doc. 26-4, ¶ 12.) After the second meeting, Kremer informed Doe that a transfer would be unlikely, as Moeller did not have any open administrative assistant positions to which Doe could transfer. (Doe Dep., Doc. 33-1, Pg. ID 1003; Kremer Decl., Doc. 26-4, ¶ 12.)

Doe retained an attorney on January 13, 2021. (Doe Dep., Doc. 33-1, Pg. ID 1052; Doe Journal, Doc. 33-2, Pg. ID 1305.) On January 20, 2021, Doe and her attorney met with Kremer, Hyzdu, and Nathan Beirsdorfer, who was Moeller's Chief Financial Officer at the time, as well as Moeller's outside counsel. (Doe Dep., Doc. 33-1, Pg. ID 1055; Doe Journal, Doc. 33-2, Pg. ID 1307; Beiersdorfer Decl., Doc. 26-1, ¶ 5; Kremer Decl., Doc. 26-4, ¶ 10.) At this meeting, Doe's attorney presented Moeller's administrative staff with a letter detailing Doe's allegations of sexual harassment by Asbeck. (Wallace Letter, Doc. 33-2, Pg. ID 1333–34; Doe Dep., Doc. 33-1, Pg. ID 1057–58; Beiersdorfer Decl., Doc. 26-1, ¶ 5; Kremer Decl., Doc. 26-4, ¶ 10.) This was the first time that Doe had reported sexual misconduct by Asbeck to Moeller's administration. (Doe Dep., Doc. 33-1, Pg. ID 1001–02, 1007, 1036, 1161–63; Doe Journal, Doc. 33-2, Pg. ID 1309.)

Immediately following the meeting with Doe and her attorney, Moeller suspended Asbeck's employment and revoked his access to the school's facilities and email system. (Kremer Decl., Doc. 26-4, ¶ 11; Doe Dep., Doc. 33-1, Pg. ID 1059–60; Doe Journal, Doc. 33-2, Pg. ID 1308.) Moeller leadership instructed Asbeck to refrain from contacting any person affiliated with Moeller. (Doe Journal, Doc. 33-2, Pg. ID 1309.) Two weeks later, on February 4, 2021, Moeller terminated Asbeck's employment following an internal investigation. (Beiersdorfer Decl., Doc. 26-1, ¶ 5; Kremer Decl., Doc. 26-4, ¶ 11; Doe Dep., Doc. 33-1, Pg. ID 1060.) Moeller also referred its findings to the local prosecutor's office. (Doe Dep., Doc. 33-1, Pg. ID 1154.)

After Doe reported Asbeck's alleged misconduct, Moeller immediately took several steps to provide Doe with support. In response to Doe's safety concerns, Moeller changed the locks to her office, and several members of Moeller's leadership team checked in with her to verify her wellbeing and provide assurance that her safety was a priority. (Doe Journal, Doc. 33-2, Pg. ID 1307–12; Doe Dep., Doc. 33-1, Pg. ID 1107.) Moeller also offered to provide Doe with assistance in seeking therapy, and she began seeing a therapist on February 10, 2021, at Moeller's expense. (Doe Dep., Doc. 33-1, Pg. ID 1062–64.) Doe continued treatment with her therapist for months and was eventually diagnosed with post-traumatic stress disorder ("PTSD"). (Doe Treatment Records, Doc. 33-2, Pg. ID 1335–58; Fienning Letter, Doc. 33-2, Pg. ID 1364–65.) Doe reported experiencing symptoms such as weight loss, inability to sleep, vomiting, inability to engage in social settings without worsened symptoms, and feelings of stress and anxiety when reminded of Asbeck's harassment. (Doe Treatment Records, Doc. 33-2, Pg. ID 1335–

58; Fienning Letter, Doc. 33-2, Pg. ID 1364–65.) Moeller was unaware of Doe's diagnosis until September 2021. (Doe Dep., Doc. 33-1, Pg. ID 1103.)

After Moeller terminated Asbeck, Doe assumed many of the duties of the athletic director position due to her familiarity with the athletic department's operations. (Doe Dep., Doc. 33-1, Pg. ID 1077.) However, Hyzdu served as acting athletic director at that time. (*Id.*) In June 2021, Moeller awarded Doe a $3,000 bonus in recognition of her increased workload. (*Id.* at Pg. ID 1077–78.) And, in July 2021, Moeller hired Justin Bayer as its new athletic director, along with two additional athletic staff members. (Doe Dep., Doc. 33-1, Pg. ID 1079, 1111.)

On August 9, 2021, Jane Doe requested a two-week vacation, and Moeller leadership approved the request—Doe ended up using only one week of that vacation. (Doe Dep., Doc. 33-1, Pg. ID 1123–24; Doe Journal, Doc. 33-2, Pg. ID 1331.) When Doe returned to the office on August 16, 2021, she found her desk space occupied by another employee, and department files had been removed from her access. (Doe Dep., Doc. 33-1, Pg. ID 1110, 1123.) Doe then met with Beiersdorfer and Bayer, and Beiersdorfer allegedly informed Doe that an internal complaint had been made against her. (*Id.* at Pg. ID 1112–13.) Doe did not receive a write-up during this meeting, and no such write-up appears in her personnel file. (Doe Dep., Doc. 33-1, Pg. ID 1113–14, 1117–18; Beiersdorfer Decl., Doc. 26-1, ¶ 7.)

On September 8, 2021, Doe requested paid medical leave under the Family and Medical Leave Act ("FMLA"), and Moeller granted her request for leave through November 30, 2021. (Doe Dep., Doc. 33-1, Pg. ID 1074–75; Wallace Email, Doc. 33-2, Pg.

ID 1359.) Attached to Doe's initial FMLA leave request was a letter from her therapist that detailed Doe's symptoms, explained her PTSD diagnosis, and recommended that she not return to work. (*See* Fienning Letter, Doc. 33-2, Pg. ID 1364–65.) Doe subsequently requested an extension of her paid FMLA leave through December 31, 2021, which Moeller also granted. (Beiersdorfer Decl., Doc. 26-1, ¶ 8.) And, on November 30, 2021, Doe informed Moeller that she planned to retire upon the expiration of her FMLA leave on December 31, 2021. (Doe Dep., Doc. 33-1, Pg. ID 1093; Doe Retirement Letter, Doc. 33-2, Pg. ID 1366.)

On April 21, 2023, Doe and her husband filed this action in the Court of Common Pleas of Hamilton County, Ohio, bringing various claims against Moeller, Asbeck, and the Archdiocese. (Compl., Doc. 4.) These claims include a claim for intentional infliction of emotional distress against Asbeck, as well as claims for sex discrimination, hostile work environment, failure to accommodate, disability discrimination, retaliation, negligent hiring, retention and supervision, respondeat superior, and loss of consortium against Moeller and the Archdiocese. (*Id.*) Moeller and the Archdiocese removed the action to this Court, with the consent of Asbeck. (*See* Notice of Removal, Doc. 1, Pg. ID 1.) Moeller and the Archdiocese filed their Answer (Doc. 5) on May 30, 2023. And, on October 13, 2023, Asbeck moved for partial judgment on the pleadings. (Motion for Judgment on the Pleadings, Doc. 11.) The Court granted Asbeck's motion in part and denied it in part, allowing the portion of Plaintiffs' intentional infliction of emotional distress claim arising from Asbeck's alleged sexual harassment of Doe to proceed. (*See* Order and Opinion, Doc. 15, Pg. ID 144–45.)

On March 28, 2025, Asbeck filed a Motion for Summary Judgment (Doc. 28), which he later modified through his Amended Motion for Summary Judgment (Doc. 34). Plaintiffs filed a Response in Opposition (Doc. 38) to Asbeck's Amended Motion for Summary Judgment, to which Asbeck filed a Reply in Support (Doc. 45). Also on March 28, 2025, Moeller and the Archdiocese filed a Motion for Summary Judgment (Doc. 29). Plaintiffs filed a Response in Opposition (Doc. 43) to Moeller and the Archdiocese's Motion for Summary Judgment, to which Moeller and the Archdiocese filed a Reply in Support (Doc. 46.)

## LAW

A court grants summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden to establish that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forth probative evidence on which a jury could reasonably reach a verdict in that party's

10

favor. *Anderson*, 477 U.S. at 251–52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As a preliminary matter, the Court weighs whether it is appropriate to consider Doe's Declaration (Doc. 36), which Plaintiffs filed just before responding to Defendants' Motions for Summary Judgment. "A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). "[I]f an affidavit directly contradicts the affiant's prior deposition testimony, it should be stricken unless the party opposing summary judgment provides a persuasive justification for the contradiction." *McClain v. Mason Cnty.*, 618 F. App'x 262, 266 (6th Cir. 2015) (cleaned up).

Plaintiffs argue that "Doe tried to report [Asbeck's] harassment multiple times to Moeller's administration, but these reports were ignored." (Response, Doc. 43, Pg. ID 1480.) This account of the facts is based on statements made for the first time in Doe's Declaration. (*See* Doe Decl., Doc. 36, Pg. ID 1402–04.) These assertions directly contradict statements Doe made in her deposition, in which she explicitly notes several times that her January 20, 2021, meeting with Moeller administrators was the first time that Doe reported sexual misconduct by Asbeck to Moeller's administration. (Doe Dep., Doc. 33-1, Pg. ID 1001–02, 1007, 1036, 1161–63.) Thus, because Doe's Declaration directly contradicts her deposition testimony, and because Plaintiffs fail to justify this

11

discrepancy, the Court will not consider Doe's Deposition to the extent that it contains statements asserting that Doe reported sexual misconduct by Asbeck prior to January 20, 2021.

Having resolved this preliminary matter, the Court will now analyze Defendants' Motions for Summary Judgment (Docs. 29, 34).

## I.   Plaintiffs' Claims Against Moeller and the Archdiocese

The Court will first address Plaintiffs' claims against Moeller and the Archdiocese. Where, as here, workplace-discrimination claims lack direct evidence of discrimination, courts apply the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First, the plaintiff bears the burden of establishing a prima facie case of discrimination. *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021). Assuming the plaintiff accomplishes this, "the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action." *Id.* If a legitimate, non-discriminatory reason is provided, "the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination." *Id.*

In federal court, federal and Ohio discrimination claims are analyzed under the same standards. *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 457 (6th Cir. 2004). Accordingly, to the extent Doe brings concurrent claims under both Title VII and Ohio Revised Code § 4112, the Court will consider them together. The Court first examines Doe's employment claims, beginning with her sex discrimination allegation. These claims are subject to the *McDonnell Douglas* burden-shifting framework. *See Howard v. Cherokee Health Sys.*, No. 24-5981, 2025 U.S. App. LEXIS 22825, at *9 (6th Cir. Sep. 2, 2025) (applying

*McDonnell Douglas* framework to sex discrimination claim); *Johnson v. DeJoy*, No. 23-1813, 2024 U.S. App. LEXIS 13961, at *19 (6th Cir. June 7, 2024) (applying *McDonnell Douglas* framework to hostile-work-environment claim); *Blank v. Nationwide Corp.*, No. 20-3969, 2021 U.S. App. LEXIS 23463, at *22 (6th Cir. Aug. 6, 2021) (applying *McDonnell Douglas* framework to disability discrimination claim under Ohio law); *Palmer v. Dep't of United States A.F.*, No. 24-3755, 2025 U.S. App. LEXIS 26974, at *9–10 (6th Cir. Oct. 15, 2025) (applying *McDonnell Douglas* framework to retaliation claim). Next, the Court addresses Doe's negligent hiring, retention, and supervision claim, as well as her claim for respondeat superior liability against Moeller and the Archdiocese. Finally, the Court turns to the claim by Doe's husband, John Doe, for loss of consortium.

### A. Jane Doe's Sex Discrimination Claim

Moeller and the Archdiocese contend that Doe's sex discrimination claim fails as a matter of law because she fails to establish a prima facie case of sex discrimination. (Motion for Summary Judgment, Doc. 29, Pg. ID 775–82.) Doe does not respond to this argument and instead asserts that she makes no such claim. (Response, Doc. 43, Pg. ID 1483, n.1.) "When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325 (6th Cir. 2023). Thus, to the extent Doe makes a claim for sex discrimination in her Complaint (Doc. 4), that claim is deemed abandoned.

### B. Jane Doe's Hostile-Work-Environment Claim

Moeller and the Archdiocese next assert that Doe's claim for hostile work environment fails as a matter of law. To establish a prima facie case of hostile work

environment, a plaintiff must show: "(1) she was a member of a protected class; (2) she was subjected to unwelcomed harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) employer liability." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 411 (6th Cir. 2021) (cleaned up). If the harassing individual is the plaintiff's supervisor, the employer is strictly liable. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). However, under the *Faragher-Ellerth* defense, "if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)); *see also Chapp v. 202 Lake St. Partners, LLC*, No. 1:23-CV-416, 2025 U.S. Dist. LEXIS 111639, at *26–27 (W.D. Mich. June 12, 2025) (describing the *Faragher-Ellerth* defense and applying it in the context of a hostile work environment claim).

Moeller and the Archdiocese contend that the *Faragher-Ellerth* defense applies, allowing them to escape liability. (Motion for Summary Judgment, Doc. 29, Pg. ID 783–84.) Doe argues that Moeller and the Archdiocese concede that a prima facie case of hostile work environment is established. (Response, Doc. 43. Pg. ID 1483.) In response, Moeller and the Archdiocese contend that they make no such concession, as they dispute that the employer liability element is established. (Reply, Doc. 46, Pg. ID 1524.) The *Faragher-Ellerth* defense, which Moeller and the Archdiocese raise, would absolve them of liability, which is the fifth element of a prima facie case of hostile work environment.

14

(*See* Motion for Summary Judgment, Doc. 29, Pg. ID 783–84.) Thus, Moeller and the Archdiocese do not concede that a prima facie case of hostile work environment is established. Additionally, in arguing that the *Faragher-Ellerth* defense applies, Moeller and the Archdiocese argue that Asbeck's harassment of Doe never led to a tangible employment action, as Doe never faced any employment consequences resulting from Asbeck's conduct. (*Id.* at Pg. ID 783.) Doe does not contest this point as it relates to the *Faragher-Ellerth* defense. (*See* Response, Doc. 43, Pg. ID 1483–86.) And, in framing an alleged constructive discharge for present purposes, "the Supreme Court in *Suders* held that a constructive discharge—where the supervisor's behavior involved no official actions—does not amount to a tangible employment action in the context of *Faragher-Ellerth*." *Chapp*, 2025 U.S. Dist. LEXIS 111639, at *26 (citing *Penn. State Police v. Suders*, 542 U.S. 129, 140, 148 (2004)). As a result, the Court will analyze whether Moeller and the Archdiocese are entitled to the *Faragher-Ellerth* defense.

The first inquiry of the *Faragher-Ellerth* analysis is whether the employer exercised reasonable care to prevent and correct any harassing behavior. *Vance*, 570 U.S. at 424. This requires a look at whether the employer had a reasonable sexual harassment policy, and whether it was effective in practice. *Wyatt*, 999 F.3d at 414. "While there is no exact formula for what constitutes a reasonable sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for

15

training regarding the policy." *Clark v. UPS*, 400 F.3d 341, 349–50 (6th Cir. 2005) (cleaned up).

Moeller and the Archdiocese assert that they exercised reasonable care to prevent and correct any harassing behavior, as they maintained a policy prohibiting sexual harassment and establishing reporting mechanisms and investigation procedures. (Motion for Summary Judgment, Doc. 29, Pg. ID 783–84.) In response, Doe argues that the policy was inadequate for purposes of the *Faragher-Ellerth* defense because it did not allow for informal complaints, and it did not provide for training. (Response, Doc. 43, Pg. ID 1484–85.) Doe also argues that the policy was ineffective in preventing and correcting sexual harassment. (*Id.*)

Moeller and the Archdiocese's sexual harassment policy, which Doe knew about and could access, did make several informal reporting channels available, but Doe chose not to use them. (Doe Dep., Doc. 33-1, Pg. ID 1145–47; Harassment Policy, Doc. 26-1, Pg. ID 679–85.) Moeller provided training on its sexual harassment policy, but Doe opted not to attend. (Doe Dep., Doc. 33-1, Pg. ID 1146.) Although Doe did not attend training on the policy, it was sufficient that Moeller gave the policy to Doe and provided training opportunities. *See Primm v. Auction Broad. Co., LLC*, No. 3:10-CV-629, 2012 U.S. Dist. LEXIS 974, at *21 (M.D. Tenn. Jan. 4, 2012) (noting that "[n]umerous courts have held that employers acted reasonably as a matter of law when they adopted valid sexual harassment policies, distributed those policies to employees via employee handbooks, and either provided no sexual harassment training or provided training only to managers"); *cf. Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 (6th Cir. 2008) (stating that

16

a sexual harassment policy should provide for training, but observing that there was no dispute regarding the reasonableness of the employer's prevention efforts where the employer distributed its policy via an employee handbook and the plaintiff received more than one copy of the handbook during her employment). Thus, Moeller and the Archdiocese clear the reasonableness hurdles outlined in *Clark*, 400 F.3d at 349–50.

When Doe reported Asbeck's sexual harassment for the first time on January 20, 2021, the school took prompt action to investigate and remediate the situation, suspending Asbeck and launching the investigation that led to the termination of his employment. (Beiersdorfer Decl., Doc. 26-1, ¶ 5; Kremer Decl., Doc. 26-4, ¶ 11; Doe Dep., Doc. 33-1, Pg. ID 1001–02, 1007, 1036, 1059–60, 1161–63; Doe Journal, Doc. 33-2, Pg. ID 1308.) Doe offers an anonymous report (Doc. 43-1, Pg. ID 1492–95) alleging that Moeller mishandled past instances of sexual harassment. However, the report is improper for the Court's consideration because it was submitted as an attachment to the declaration of Doe's attorney, who has no personal knowledge of the allegations in the anonymous report and Moeller's actions in response. *See Brainard v. Am. Skandia Life Assurance Corp.*, 432 F.3d 655, 667 (6th Cir. 2005) (noting that the district court's consideration of an attorney affidavit was improper because it was not based on personal knowledge). Doe also points out that it took over three years for Moeller and the Archdiocese to investigate a 2016 incident involving inappropriate conduct by Asbeck at a Moeller golf outing. (Response, Doc. 43, Pg. ID 1485.) However, because this incident did not involve sexual harassment, this contention has no relevance to the Court's analysis here, especially because there is no evidence to suggest that this encounter was nonconsensual, and

17

because Moeller did not learn about it until years later. The Court therefore finds that Moeller and the Archdiocese exercised reasonable care to prevent and correct any harassing behavior, fulfilling the first element of the *Faragher-Ellerth* defense.

The second inquiry of the *Faragher-Ellerth* analysis is whether the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. *Vance*, 570 U.S. at 424. This requires a look at how and when the plaintiff used the employer's existing corrective and protective measures. *Wyatt*, 999 F.3d at 415–16. The Sixth Circuit has found that an employee unreasonably fails to take advantage of corrective opportunities when she waits multiple months or years to report harassment. *See Thornton*, 530 F.3d at 457–58 (unreasonable reporting delay of two months); *EEOC v. AutoZone, Inc.*, 692 F. App'x 280, 286 (6th Cir. 2017) (unreasonable reporting delay between two and two-and-a-half months); *Deters v. Rock-Tenn Co.*, 245 F. App'x 516, 527 (6th Cir. 2007) (unreasonable reporting delay of three years). "All of the facts and circumstances must be evaluated to determine whether the plaintiff[] unreasonably failed to take advantage of [the employer's] harassment policy." *Shields v. Fed. Express Customer Info. Servs.*, 499 F. App'x 473, 482 (6th Cir. 2012) (cleaned up).

While the harassing conduct by Asbeck began as early as August 2016, with the first sexual assault taking place in September 2020 and the last taking place in November or December of 2020, Doe did not report any of this conduct to Moeller administrators until January 20, 2021. (Doe Dep., Doc. 33-1, Pg. ID 994–1042, 1161–63; Doe Journal, Doc. 33-2, Pg. ID 1309.) Thus, Doe waited over four years from the start of Asbeck's harassment, over four months from the first sexual assault incident, and around two

18

months from the final sexual assault incident to report any misconduct by Asbeck. Doe claims that she was unaware of her reporting options, but this supposed lack of knowledge does not excuse her failure to take advantage of corrective opportunities, as she knew about and had access to the sexual harassment policy contained in Moeller's employee handbook. (Response, Doc. 43, Pg. ID 1485–86; Doe Dep., Doc. 33-1, Pg. ID 1145–47.) Additionally, Doe notes that she knew that she could report Asbeck's harassment to Kremer and Hyzdu, so her lack of knowledge about other reporting options fails to convince. (Response, Doc. 43, Pg. ID 1485–86; Doe Decl., Doc. 36, ¶ 17.) This point is bolstered by the fact that Moeller took swift corrective action after Doe eventually reported Asbeck's harassment to administrators, including Kremer and Hyzdu, on January 20, 2021. (Beiersdorfer Decl., Doc. 26-1, ¶ 5; Kremer Decl., Doc. 26-4, ¶ 11; Doe Dep., Doc. 33-1, Pg. ID 1001–02, 1007, 1036, 1059–60, 1161–63; Doe Journal, Doc. 33-2, Pg. ID 1308.) Moeller's swift corrective action also demonstrates that reporting Asbeck's misconduct would not have been futile. As a result, the Court finds that Doe unreasonably failed to take advantage of the corrective opportunities that Moeller and the Archdiocese provided. Thus, Moeller and the Archdiocese have established the elements of the *Faragher-Ellerth* defense and Doe's claim for hostile work environment therefore fails.

## C. Jane Doe's Failure to Accommodate Claim

Next, Moeller and the Archdiocese argue that Doe's claim for failure to accommodate fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 785–86.) Doe, however, asserts that her Complaint (Doc. 4) does not allege a failure-to-

19

accommodate claim. (Response, Doc. 43, Pg. ID 1486.) Thus, to the extent Doe makes a claim for failure to accommodate in her Complaint (Doc. 4), that claim is deemed abandoned. *See Bennett*, 86 F.4th at 325.

### D. Jane Doe's Disability Discrimination Claim

Moeller and the Archdiocese next argue that Doe's claim for disability discrimination fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 786–87.) Doe brings her disability discrimination claim purely under Ohio law—not the federal Americans with Disabilities Act ("ADA"). (*See* Compl., Doc. 4, Pg. ID 56–57; Response, Doc. 43, Pg. ID 1486–87.) "In order to demonstrate a prima facie case of disability discrimination under Ohio law, a plaintiff must show (1) that he or she was disabled; (2) that the employer took an adverse employment action against the employee, at least in part, because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability." *Blank*, 2021 U.S. App. LEXIS 23463, at *22 (cleaned up). Because "Ohio's disability-discrimination statute and the ADA employ the same analysis," the Court will analyze Doe's claim through the lens of federal case law analyzing both the ADA and Ohio's disability discrimination statute. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 872 (6th Cir. 2007); *see also City of Columbus Civ. Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (Ohio 1998) (noting that the "federal Americans with Disabilities Act (ADA) is similar to the Ohio [disability] discrimination law," so courts may "look to . . . cases interpreting the federal Act for guidance in [their] interpretation of Ohio law").

20

Moeller and the Archdiocese argue that Doe fails to show that she suffered an adverse employment action. (Motion for Summary Judgment, Doc. 29, Pg. ID 786; Reply, Doc. 46, Pg. ID 1532–33.) Moeller and the Archdiocese also argue that they lacked knowledge about Doe's disability, so even if there were an adverse employment action, it could not have been because of her disability. (*Id.*) In asserting that Doe fails to show that she suffered an adverse employment action that was based on her disability, Moeller and the Archdiocese advance several arguments. First, Moeller and the Archdiocese note that any claim by Doe that she was demoted is without merit, as she served in the same position from 2003 until her voluntary retirement—no demotion ever occurred. (Motion for Summary Judgment, Doc. 29, Pg. ID 777, 786.) Next, Moeller and the Archdiocese argue that the increased workload that Doe experienced in the Spring of 2021 was not an adverse employment action. (*Id.*) Moeller and the Archdiocese also assert that the write-up that Doe claims to have received never existed, and that it would not be an adverse employment action even if it did exist. (*Id.* at Pg. ID 777–78, 786.) Finally, Moeller and the Archdiocese argue that Doe was not constructively discharged. (*Id.* at Pg. ID 778–81, 786.) Doe does not respond to Moeller and the Archdiocese's arguments as to demotion and increased workload, and she instead focuses her argument on advancing a theory of constructive discharge. (Response, Doc. 43, Pg. ID 1486–87.) In support, Doe points to the supposed write-up and Moeller's hiring of other employees. (*Id.*)

With these arguments in mind, the Court outlines the governing standards. "An adverse employment action is a materially adverse change in the terms or conditions of employment because of the employer's conduct." *Talley v. Family Dollar Stores of Ohio,*

21

*Inc.*, 542 F.3d 1099, 1107 (6th Cir. 2008) (cleaned up). And, "[t]he existence of a constructive discharge depends upon the facts of each case and requires an inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct upon the employee." *Smith v. Henderson*, 376 F.3d 529, 533 (6th Cir. 2004) (cleaned up). "A constructive discharge requires a determination that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* at 533–34 (cleaned up). The following factors are relevant in considering whether work conditions were so intolerable that a reasonable person would have felt compelled to resign: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status." *Laster v. City of Kalamazoo*, 746 F.3d 714, 728 (6th Cir. 2014) (citing *Logan v. Denny's*, 259 F.3d 558, 569 (6th Cir. 2001)).

The record here lacks evidence of any of the factors outlined in *Laster*. Doe was never demoted during her employment at Moeller, and her salary was never lowered. Her job responsibilities were never reduced, and she was never reassigned to menial or degrading work—indeed, Doe's job responsibilities increased after Asbeck's employment was terminated, and she received a $3,000 bonus as a result. (Doe Dep., Doc. 33-1, Pg. ID 1077–78.) The briefing points to no evidence that Doe was reassigned to work under a younger supervisor, and there is no evidence that Moeller leadership harassed

22

Doe or offered her either early retirement or continued employment on less favorable terms.

In arguing that she was constructively discharged, Doe asserts that Moeller engaged in a course of conduct to oust her and force her retirement, and that Moeller did not immediately terminate her employment because her work became essential during the interim period between Asbeck's discharge and the hiring of his replacement. (Response, Doc. 43, Pg. ID 1486–87.) Doe contends that Moeller's hiring of two new assistants in the athletic department, as well as the supposed write-up, made it clear that her discharge was inevitable. (*Id.*) This theory encounters two problems. First, Doe does not provide, and the Court is unaware of, any precedent that shows that hiring additional staff or placing a write-up in an employee's personnel file would lead to an intolerable work environment sufficient to demonstrate a constructive discharge. Second, the record shows that no write-up was ever placed in Doe's personnel file, and it does not show that the new assistants in the athletic department were hired to replace Doe. To the extent there exists a dispute of fact as to whether Doe was told that a write-up would be placed in her file, such a dispute is relevant but not dispositive here because, even if she was told this, it does not establish a constructive discharge. Therefore, Doe does not demonstrate a constructive discharge and thus does not show that she faced an adverse employment action that was taken by Moeller and the Archdiocese because of her disability.

As Moeller and the Archdiocese point out, even if Doe could establish that an adverse employment action was taken, she cannot show that such an action was taken due to her disability. (Motion for Summary Judgment, Doc. 29, Pg. ID 787–88.) And, Doe

does not address this argument in her Response, so she concedes this point and the Court need not analyze it further. *See Campbell v. Hines*, No. 12-4329, 2013 U.S. App. LEXIS 26071, at *13–14 (6th Cir. Aug. 8, 2013) ("In light of [the plaintiff's] failure to address the defendants' arguments in his response to the summary judgment motion, the district court properly declined to consider the merits of the claims."). In any event, the record shows that Moeller's administration was unaware of Doe's PTSD diagnosis during the relevant period, so any adverse employment action could not have been taken on the basis of her disability. (Doe Dep., Doc. 33-1, Pg. ID 1103.) Therefore, Doe fails to establish a prima facie case of disability discrimination under Ohio law, and her claim for disability discrimination fails as a result.

### E. Jane Doe's Retaliation Claim

Moeller and the Archdiocese next argue that Doe's retaliation claim fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 787–89.) "To establish a prima facie case of retaliation a plaintiff must establish that: (1) she engaged in a protected activity; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (cleaned up). As it relates to the third element of this test, "[a] plaintiff's burden of establishing a materially adverse employment action is less onerous in the retaliation context than in the anti-discrimination context." *Laster*, 746 F.3d at 718. Still, a plaintiff must show that the action taken by the employer was materially adverse such that it "well might have dissuaded a

24

reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (cleaned up).

Doe contends that her constructive discharge theory establishes the materially adverse action element. (Response, Doc. 43. Pg. ID 1487–88.) But, as outlined above, Doe has failed to show that she suffered an adverse employment action or was constructively discharged. Plaintiff provides no other argument in support of her contention that Moeller and the Archdiocese subjected her to a materially adverse employment action. (*See id.*) And, the Court finds that the events giving rise to Doe's constructive discharge theory would not have dissuaded a reasonable worker from engaging in protected activity. Indeed, while the record shows that no write-up was ever placed in Doe's personnel file, a write-up alone would be insufficient to establish a materially adverse action. *See Chavez-Deremer v. Tosh Pork, LLC*, No. 1:24-CV-1038, 2025 U.S. Dist. LEXIS 193263, at *27 (W.D. Tenn. Sep. 30, 2025) (finding that "a write-up alone, without some other adverse effect, is not sufficient to constitute an adverse employment action" in the retaliation context). Further, as discussed above, the record does not show that the new assistants in the athletic department were hired to replace Doe. Thus, Doe cannot establish the materially adverse action element in the retaliation context.

Moeller and the Archdiocese argue that even if Doe could show that she faced an adverse employment action or was constructively discharged, she cannot demonstrate causation between her harassment complaint and any adverse employment action. (Motion for Summary Judgment, Doc. 29, Pg. ID 787–88.) Doe does not address this argument in her Response, so the Court need not address the merits of this argument. *See*

25

*Campbell*, 2013 U.S. App. LEXIS 26071, at *13–14. Regardless, the Court finds Moeller and the Archdiocese's argument here to be persuasive. The actions that Doe contends were the start of Moeller and the Archdiocese's push to constructively discharge her took place five months after Doe's harassment complaint, so Doe must provide additional evidence showing retaliatory intent. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (noting that when extensive time elapses between an employer learning of protected activity and an adverse action, the employee must show additional evidence of retaliatory intent to show causation); *Barrow v. City of Cleveland*, 773 F. App'x 254, 264 (6th Cir. 2019) ("a gap of approximately four-to-five months is insufficient, without additional evidence, to imply causation"). Doe fails to provide such evidence of retaliatory intent. As a result, Doe fails to demonstrate both causation and that she faced an adverse employment action, so she cannot establish a prima facie case of retaliation. Doe's claim for retaliation fails as a result.

### F. Jane Doe's Negligent Hiring, Retention, and Supervision Claim

Moeller and the Archdiocese next argue that Doe's negligent hiring, retention, and supervision claim fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 789–90.) "Negligent hiring, retention, and supervision claims under Ohio law require proof of five elements: (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee was the proximate cause of the plaintiff's injuries." *Watson v. City of Cleveland*, 202 F. App'x 844, 857 (6th Cir. 2006) (citing

*Linder v. Am. Nat'l Ins. Co.*, 798 N.E.2d 1190, 1197 (Ohio Ct. App. 2003)). Moeller and the Archdiocese contend that Doe fails to establish the third and fifth elements of this test. (Motion for Summary Judgment, Doc. 29, Pg. ID 789.)

"In claims for negligent hiring, retention, and supervision, foreseeability is the test of employer liability." *Cole v. Am. Cmty. Servs.*, No. 2:04-CV-738, 2006 U.S. Dist. LEXIS 75431, at *17 (S.D. Ohio Oct. 17, 2006) (cleaned up). "[T]he plaintiff must focus the inquiry on the employer and not on what the employee did. If the plaintiff shows facts indicating the employee had a past history of criminal or tortious conduct about which the employer knew or should have known, summary judgment is improper and a question of fact is raised . . . . The relevant inquiry is whether facts existed that the employer should have known about." *Dawson v. Airtouch Cellular*, 42 F. Supp. 2d 767, 772 (S.D. Ohio 1999) (cleaned up) (quoting *Stephens v. A-Able Rents Co.*, 654 N.E.2d 1315, 1319 (Ohio Ct. App. 1995)).

Here, prior to hiring Asbeck, Moeller and the Archdiocese confirmed that he had no criminal background and no record of misconduct in his past employment. (Collison Decl., Doc. 32-3, ¶ 9; Asbeck Dep., Doc. 25-1, Pg. ID 612.) The Archdiocese conducted periodic background checks on Asbeck during his employment at both Moeller and another archdiocesan school, confirming in 2010, 2015, and 2020 that he had no criminal record. (Collison Decl., Doc. 32-3, ¶ 10; Kremer Decl., Doc. 26-4, ¶ 6.) There is no evidence that Asbeck engaged in any criminal or harassing behavior before the incidents alleged by Doe, and Moeller suspended Asbeck's employment immediately after Doe reported

his misconduct for the first time on January 20, 2021. (Doe Dep., Doc. 33-1, Pg. ID 1001–02, 1007, 1036, 1161; Doe Journal, Doc. 33-2, Pg. ID 1309.)

Pointing to her Declaration (Doc. 36), Doe contends that she reported Asbeck's sexual harassment to Moeller administrators on multiple occasions, giving Moeller and the Archdiocese constructive knowledge of Asbeck's harassing behavior. (Response, Doc. 43, Pg. ID 1489.) But, as discussed above, the Court will not consider this declaration to the extent that it contradicts Doe's previous deposition testimony that she never reported sexual misconduct by Asbeck prior to January 20, 2021. The record therefore demonstrates that Moeller and the Archdiocese had no actual or constructive knowledge of Asbeck's propensity to commit acts of sexual harassment, so his harassment of Doe could not have been foreseeable to them. Thus, Doe fails to show that Moeller and the Archdiocese were negligent in hiring and retaining Asbeck, and Doe's claim for negligent hiring, retention, and supervision fails as a result.

### G. Jane Doe's Respondeat Superior Claim

Moeller and the Archdiocese next argue that Doe's respondeat superior claim fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 791.) Under the doctrine of respondeat superior, "generally, an employer or principal is vicariously liable for the torts of its employees or agents," but "[t]he application of respondeat superior depends on the existence of control by a principal (or master) over an agent (or servant)." *Kirby Devs. LLC v. XPO Glob. Forwarding, Inc.*, No. 2:18-CV-500, 2021 U.S. Dist. LEXIS 170709, at *51 (S.D. Ohio Sep. 9, 2021) (cleaned up) (quoting *Nat'l Union Fire Ins. Co. v. Wuerth*, 122 Ohio St. 3d 594, 599 (Ohio 2009)). And, "[u]nder Ohio law, an employee acts

28

within the scope of [his] employment if his conduct: (1) is of the kind which he is employed to perform; (2) occurs substantially within the authorized limits of time and space; and (3) is actuated, at least in part, by a purpose to serve the employer." *Dodge v. United States*, 162 F. Supp. 2d 873, 884 (S.D. Ohio 2001) (citing *Anderson v. Toeppe*, 688 N.E.2d 538, 543 (Ohio Ct. App. 1996)). "[A]n employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Kirby*, 2021 U.S. Dist. LEXIS 170709, at *51–52 (quoting *Byrd v. Faber*, 57 Ohio St. 3d 56, 59 (1991)).

Moeller and the Archdiocese correctly assert that Doe's respondeat superior claim fails because Asbeck's alleged sexual harassment of Doe was outside the scope of his employment and could not have possibly been actuated to further the interests of Moeller and the Archdiocese. (Motion for Summary Judgment, Doc. 29, Pg. ID 791.) Doe does not respond to this argument, so it is conceded, and her respondeat superior claim fails for that reason alone. *See Campbell*, 2013 U.S. App. LEXIS 26071, at *13–14. Doe points to *Wille v. Hunkar Labs.*, 724 N.E.2d 492 (Ohio Ct. App. 1998), which, she argues, allows for vicarious liability for an employee's harassing behavior if an employer cannot assert the *Faragher-Ellerth* defense. (Response, Doc. 43, Pg. ID 1489.) But, as discussed above, Moeller and the Archdiocese successfully established the *Faragher-Ellerth* defense, so Doe's respondeat superior claim fails regardless.

### H. John Doe's Loss of Consortium Claim

Finally, Moeller and the Archdiocese argue that John Doe's claim for loss of consortium fails as a matter of law. (Motion for Summary Judgment, Doc. 29, Pg. ID 1489.) Both the Sixth Circuit and the Supreme Court of Ohio have held that when a claim for

loss of consortium is a derivative action, it cannot exist absent the primary claim. *See Monak v. Ford Motor Co.*, 95 Fed. Appx. 758, 768 (6th Cir. 2004); *Bowen v. Kil-Kare, Inc.*, 63 Ohio St. 3d 84, 92 (Ohio 1992) ("Where the action for loss of consortium is seen as purely derivative of the original cause of action for the injury, it has been held that once the original cause of action has been released, the action for loss of consortium is also barred."). Here, John Doe's loss of consortium claim is derivative, and because all claims against Moeller and the Archdiocese that could support this claim have been dismissed, the loss of consortium claim is likewise dismissed. *See Ganz v. Pappas Rests., Inc.*, No. 1:19-CV-235, 2020 U.S. Dist. LEXIS 100213, at *9–10 (S.D. Ohio June 8, 2020).

## II.  Doe's Remaining Claim Against Asbeck

Having addressed Plaintiffs' claims against Moeller and the Archdiocese, the Court now turns to Doe's sole remaining claim against Asbeck. But, the Court must first determine whether to exercise its discretion to proceed with an analysis of this state-law claim. A court "may decline to exercise supplemental jurisdiction over a claim . . . [if it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "Residual jurisdiction should be exercised only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (cleaned up). And, "[t]he discretion to decline supplemental jurisdiction over State-law claims extends to all stages

of litigation, including summary judgment." *Buddenberg v. Est. of Weisdack*, 711 F. Supp. 3d 712, 794 (N.D. Ohio 2024).

This case has been pending since 2023, and the record is both substantial and complex. The parties have invested a significant amount of time and resources in developing the record, including in briefing the merits of Plaintiffs' state-law claims. Thus, the Court finds that the interests of judicial economy and the avoidance of multiplicity of litigation outweigh the state interests at play here. The convenience to the parties and fundamental fairness also cut in favor of resolving the remaining claim. *See Buddenberg*, 711 F. Supp. 3d at 794 (citing *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000)); *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172 (1997). Therefore, having disposed of all other claims in this case, the Court exercises its discretion to proceed with an analysis of Doe's sole remaining state-law claim against Asbeck.

Asbeck argues that he is entitled to summary judgment on Plaintiffs' remaining intentional infliction of emotional distress ("IIED") claim against him. (Motion for Summary Judgment, Doc. 34, Pg. ID 1390–93.) To succeed on a claim for IIED, Ohio law requires that a plaintiff prove that "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) (citation omitted).

Asbeck asserts that the record lacks evidence that he committed any extreme and outrageous conduct. (Asbeck Motion, Doc. 34, Pg. ID 1391.) "[C]onduct giving rise to an

31

intentional infliction of emotional distress claim must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Long v. Ford Motor Co.*, 193 F. App'x 497, 503 (6th Cir. 2006) (quotations omitted). Indeed, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient acts to give rise to an IIED claim. *Yeager v. Loc. Union 20*, 6 Ohio St.3d 369, 375 (Ohio 1983). "[S]exual harassment in the workplace may constitute intentional infliction of emotional distress." *Zimmer v. Ashland Univ.*, No. 1:00-CV-630, 2001 U.S. Dist. LEXIS 15075, at *35 (N.D. Ohio Sep. 5, 2001). But, "[s]exual harassment is not extreme and outrageous enough to sustain a claim for IIED under Ohio law when, even if distasteful, the alleged comments and actions were not, for example, severe or physically threatening or humiliating." *Heimberger v. Pritzker*, No. 2:12-CV-1064, 2014 U.S. Dist. LEXIS 34504, at *31 (S.D. Ohio Mar. 17, 2014) (cleaned up) (citing *Harter v. Chillicothe Long-Term Care, Inc.*, 2012 Ohio App. LEXIS 2153, at *11 (Ohio Ct. App. 2012)).

Because Doe's IIED claim has been dismissed as it relates to Asbeck's alleged physical assaults of Doe, the Court considers only the evidence that relates to the alleged non-physical sexual harassment. Here, the facts on the record show that Asbeck made comments about Doe's clothing, nail polish choices, and hair, and that Asbeck would periodically ask to hug Doe. (Doe Dep., Doc. 33-1, Pg. ID 1037, 1041–42.) Further, Asbeck confessed his sexual desire for Doe, who is married, requesting that she engage in phone sex with him and repeatedly asking her to engage in sexual acts, despite her refusals. (*Id.* at Pg. ID 1044; Doe Journal, Doc. 33-2, Pg. ID 1304.) Asbeck also told Doe that he could

not stand up when he looked at her in the office, suggesting his sexual arousal. (Doe Journal, Doc. 33-2, Pg. ID 1304.) Asbeck asks the Court to disregard these facts, as they are included in Doe's Declaration (Doc. 36), which he characterizes as "self-serving." (Asbeck Reply, Doc. 45, Pg. ID 1516–20.) But, even without Doe's Declaration, the facts on the record include ample evidence of this conduct. (*See* Doe Dep., Doc. 33-1, Pg. ID 1037, 1041–42, 1044; Doe Journal, Doc. 33-2, Pg. ID 1304.)

"To say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (quoting *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993)). Because of this narrow interpretation, courts have granted summary judgment on IIED claims involving severe and reprehensible conduct, including sexual harassment. *See, e.g., Colston v. Cleveland Pub. Library*, 522 F. App'x 332, 336–37, 340 (6th Cir. 2013) (affirming the finding of no extreme and outrageous conduct where a defendant made demeaning comments about the plaintiff's appearance and clothing, suggested his openness to having sex with the plaintiff, and talked openly with plaintiff about female co-workers with whom he had been intimately involved); *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 777 (6th Cir. 1996) (affirming the finding of no extreme and outrageous conduct where a co-worker threatened the plaintiff's employment stability, offered a job promotion in exchange for apparent sexual favors, repeatedly called and wrote to her, and discussed sexual fantasies involving her); *Mullholand v. Harris Corp.*, No. 94-3725, 1995 U.S. App. LEXIS 37000, at *15 (6th Cir. Dec. 8, 1995) (affirming the finding of no extreme and outrageous conduct where a co-worker asked the plaintiff for sex, spread

33

rumors about her sleeping with him, and pushed her against a locker); *see also Summerville v. Ross/Abbott Labs.*, No. 98-3517, 1999 U.S. App. LEXIS 21009, at *6-7 (6th Cir. Aug. 10, 1999) (affirming dismissal of IIED claim at pleading stage where defendants made "unwelcome lewd jokes, comments, body movements and baring of body parts, as well as sexual come-ons and unwelcome touching"); *Wolfe v. Thermo Fisher Sci., Inc.*, No. 2:08-CV-933, 2009 U.S. Dist. LEXIS 41702, at *5–9 (S.D. Ohio May 4, 2009) (dismissing IIED claim at the pleading stage where a defendant made sexual comments to the plaintiff, falsely accused her of sexual harassment, and falsely imprisoned her for four hours with no food or water while interrogating and intimidating her).

With this corpus of case law in mind, and viewing the facts in this case in the light most favorable to Doe as the non-moving party, the Court finds that a jury could not reasonably conclude that Asbeck's non-physical conduct was extreme and outrageous. In reaching this conclusion, the Court in no way diminishes the nature of the alleged conduct in this case or the effects felt by Plaintiff. But, given Ohio's extremely high bar to demonstrate extreme and outrageous conduct, as well as the Court's inability to consider the physical aspects of the alleged misconduct, Doe's remaining IIED claim against Asbeck falls short on the extreme and outrageous prong. Accordingly, the Court grants Asbeck's Motion for Summary Judgment on Doe's remaining claim for IIED.

## CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

1. Defendants Archdiocese of Cincinnati and Moeller High School's Motion for Summary Judgment (Doc. 29) is **GRANTED**;

2. Summary judgment is **ENTERED** in favor of Defendants Archdiocese of Cincinnati and Moeller High School on all claims against them;

3. Defendant Michael Asbeck's Amended Motion for Summary Judgment (Doc. 34) is **GRANTED**;

4. Summary judgment is **ENTERED** in favor of Defendant Michael Asbeck on the remaining claim against him;

5. Defendant Michael Asbeck's Motion for Summary Judgment (Doc. 28) is **DENIED AS MOOT**; and

6. This matter is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

35